UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                   )
WARREN WEST,                       )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )  C.A. No. 12-781 S
                                   )
THOMAS HOOVER, et al.,             )
                                   )
        Defendants.                )
_____)

## ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendants' Motion for Summary Judgment (ECF No. 52) ("Defendants' Motion" or "Defs.' MSJ"). Plaintiff Warren West ("West") filed an Opposition (ECF No. 55) ("Pl.'s Opp'n") and Defendants filed a Reply (ECF No. 56) ("Defs.' Reply"). After careful consideration, Defendants' Motion is GRANTED for the reasons set forth below.

I.   Background[1]

West is the former Finance Director for the Town of Coventry (the "Town"). (Defs.' Statement of Undisputed Facts

---

[1] The Court gleans these facts from Defendants' Statement of Undisputed Facts ("Defs.' SUF") (ECF No. 53), West's Statement of Undisputed Facts ("Pl.'s SUF") (ECF No. 62), and the evidence the parties attached to these documents and to the parties' respective briefs. In all instances, the Court interprets facts properly supported by the record in the light most favorable to West, the non-moving party.

("Defs.' SUF") ¶ 1, ECF No. 53.) On July 7, 2010, the Town suspended him with pay while it investigated an issue between the Town and the Coventry School Department concerning funding for the school department. (Ex. 2, Defs.' MSJ, ECF No. 52-4.) The details of the funding issue are not material to this dispute, but briefly, Rhode Island law at the time required municipalities to provide at least the same amount of local funds to their school systems from year to year. (Ex. 5 pp. 7-8, Defs.' MSJ, ECF No. 52-7; Ex. A, Pl.'s Statement of Undisputed Facts ("Pl.'s SUF"), ECF No. 62-1.) The required funding level was termed "maintenance of effort." (Id.) In mid-2010, the Coventry School

---

However, "[d]istrict courts are not required to ferret through sloppy records in search of evidence supporting a party's case." Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 51 (1st Cir. 2005). It would be generous to describe West's citation to the record as "sloppy." First, West did not expressly controvert Defendants' Statement of Facts, in violation of LR Cv 56(a)(3). Further, West does not support his purported facts in his Opposition and Statement of Undisputed Facts with proper citations to the record. West only sporadically cites to the record in his Opposition and where he does, the exhibit numbers in his brief do not correspond to the exhibits he filed with the Court. West's Statement of Facts does not conform to LR Cv 56(a)(2); West cites to exhibits containing multiple documents or pages of transcripts but does not direct the Court's attention to a page or line number to support his proposition. Thus, where West has directed the Court to evidence supporting his assertions of fact, the Court has interpreted the facts in the light most favorable to him. But where West has either failed to cite to the record or the Court could not identify the evidence to which West cited, the Court gives West's contention no weight.

Superintendent believed that the Town impermissibly cut school funding by $225,000 and requested that the Rhode Island Department of Education ("RIDE") investigate. (See Ex. 4, Pl.'s Opp'n, ECF No. 55-4; Ex. 5, Pl.'s Opp'n, ECF No. 55-5.)

After RIDE commenced an investigation into the Town's maintenance of effort funding, the Town Council hired Ernest Almonte ("Almonte"), a private auditor, to explore West's involvement in the issue. (Defs.' SUF ¶¶ 3-4, ECF No. 53.) On August 12, 2010, Almonte completed his investigation and filed his report with the Town (the "Almonte Report" or "Report"). (Id. ¶ 5.) The Report concluded that West "did not provide proper oversight and due diligence in the accounting treatment" of $225,000 in State housing aid that was initially reserved for school department capital projects. (Ex. 5 p. 12, Defs.' MSJ, ECF No. 52-7.) It also concluded that West "should have recognized the accounting problem" and "revealed it . . . to the State, and worked with the special legal counsel to clarify the situation . . . ." (Id.)

On August 13, 2010, Thomas Hoover ("Hoover"), Coventry's Town Manager, forwarded West a copy of the Almonte Report. (See Ex. 6, Defs.' MSJ, ECF No. 52-8.) In a letter accompanying the Report, Hoover indicated that "[b]ased on

3

the [Report], [his] own observations, discussions with Town employees, discussions with financial and legal advisors to the Town . . . and [his] other investigations," he did not have confidence in West's job performance and was considering terminating West's employment. (Id.)  However, prior to taking any employment action, Hoover offered West an informal hearing to respond to Hoover's letter, the charges set forth therein, and the issues raised in the Almonte Report. (Id.)[2]

West availed himself of the informal hearing which took place on August 20, 2010 at the law office of the Town's Solicitor, Patrick Rogers ("Rogers"). (Defs.' SUF ¶ 7, ECF No. 53.)  West attended with his attorney; Hoover and Rogers

---

[2] The parties dispute who actually wrote the letters from Hoover.  West contends that Coventry's legal counsel, Patrick Rogers ("Rogers"), actually wrote the letters. (Pl.'s SUF ¶ 5, ECF No. 62.)  The Town admits that Hoover consulted with legal counsel when drafting the letters but disputes that Rogers actually wrote them. (Defs.' Statement of Disputed Facts ("Defs.' SDF") ¶ 5, ECF No. 64.)  The evidence on which West relies for his assertion clearly states Rogers assisted in drafting at least one letter:

    Q:   And did you prepare this letter by yourself?
    A:   No.
    Q:   Who assisted you in doing it?
    A:   Patrick Rogers.

(Ex. B p. 16:16-20, Pl.'s SUF, ECF No. 62-2.)  The parties do not point to any evidence stating that Rogers actually wrote the letters.  Nevertheless, the dispute seems to be one of semantics.  Both Hoover and Rogers had a role in drafting the letters.

attended for the Town. (Id.) While West could not cross-examine individuals about the Almonte Report, West did have the opportunity to present his side of the story, suggest areas that the Town may want to investigate, and point out discrepancies in the allegations against him. (Ex. D, Pl.'s SUF, ECF No. 62-4.) Indeed, West gave the Town a line-by-line opposition to the Almonte Report at the hearing. (Pl.'s Opp'n 31, ECF No. 55; Ex. 52, Pl.'s Opp'n, ECF No. 55-55.)

Hoover terminated West's employment on August 20, 2010, shortly after the hearing. (See Ex. 8, Defs.' MSJ, ECF No. 52-10; Pl.'s SUF ¶ 7, ECF No. 62.) The "Termination Notice" explained that "based on the investigation and report referenced in [the Town's] letter to [West] dated August 13, 2010 and following the informal due process hearing of today with [West's] attorney," West's employment was terminated. (Ex. 8, Defs.' MSJ, ECF No. 52-10.) The notice also advised West that, pursuant to Section 51-20(D) of the Coventry Code of Ordinances, he had two weeks to request a hearing before the Town Personnel Board (the "Board"). (Id.)

West exercised his right to a hearing, and the hearing took place over five days between September 23, 2010 and March 24, 2011. (Defs.' SUF ¶ 13, ECF No. 53; Ex. 13, Defs.' MSJ, ECF No. 52-15.) The Board, reconstituted on July 19, 2010, was composed of three members, two of whom were affiliated

5

with the Republican Party, one of whom was not affiliated with any political party. (Ex. J p. 1, Pl.'s SUF, ECF No. 62-10.)[3] Patrick Rogers acted as the impartial hearing officer for the first two days of the hearing; Frederick G. Tobin acted as the hearing officer for the remaining three sessions. (Ex. 13, Defs.' SUF, ECF No. 52-15.) Pursuant to the Town's Personnel Ordinance, the Board was tasked with making an advisory recommendation to the appointing authority, in this case, the Town Manager, as to whether West proved by clear and convincing evidence that his termination "was based on political, religious or racial prejudice or that the appointing authority failed to notify the employee

---

[3] West asserts that the Town improperly created the Board. His most significant allegation is that Coventry Town Council Vice President, Laura Flanagan ("Flanagan"), impermissibly sought to create a "politically oriented" Board. (Pl.'s SUF ¶ 13, ECF No. 62.) In support of this assertion, West cites to an email in which Flanagan outlines the individuals she had "secured" for the board (Ex. J p. 2, Pl.'s SUF, ECF No. 62-10), and other documents showing (1) that the Town Council appointed the prospective members Flanagan had "secured" (id. at p. 4), (2) that two of the new members affiliated with the Republican Party, while one was unaffiliated, (id. at pp. 2, 4), and (3) that each of the prior Board members' terms had expired by July 1, 2010, (id. at p. 5). Nothing in this evidence suggests that Flanagan sought to create a politically oriented personnel board. It shows, at best, that the Board was composed of two members of the Republican Party, a permissible composition under the Town's Charter. (See Defs.' SDF ¶ 13, ECF No. 64.)

6

in accordance [with the required procedures]." (Defs.' SUF ¶¶ 10, 12, ECF No. 53; Ex. 13, Defs.' MSJ, ECF No. 52-15.)

During the hearing, each side admitted numerous exhibits and each called two witnesses. (Ex. 13, Defs.' MSJ, ECF No. 52-15.) The Town called Hoover and Almonte. (Id.) West had the opportunity to cross-examine both witnesses. (See Defs.' MSJ 14, ECF No. 52-1.) West also called Kenneth Cloutier, a former Coventry town councilman and Cheryl George, the Coventry Town Clerk. (Ex. 13, Defs.' MSJ, ECF No. 52-15.) After the hearing, on July 28, 2011, the Board determined that there was not clear and convincing evidence that the Town had acted with religious, racial or political prejudice in terminating West's employment. (Id.) The Board also determined that there was clear and convincing evidence that the Town notified West of the reasons for his termination in accordance with Town policy. (Id.) Based on these findings, the Board dismissed West's appeal. (Id.)

West filed this lawsuit in Rhode Island Superior Court on July 26, 2012, and the Town subsequently removed it to this Court due to the presence of a federal question. (ECF No. 1.) After failed motions to dismiss West's claims (ECF Nos. 19, 22, 23) and numerous discovery extensions, Defendants sought leave to file the present motion (ECF No. 48), which the Court granted (Text Order from 11/3/14 granting

7

ECF No. 48). Defendants then moved for summary judgment as to all of West's claims. (ECF No. 52.) For the reasons explained below, the Court grants Defendants' motion.

II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is only considered "'genuine' if it 'may reasonably be resolved in favor of either party.'" Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). When deciding a motion for summary judgment, the court must "examine[] the entire record 'in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor.'" Id. at 959 (quoting Maldonado-Denis, 23 F.3d at 581).

III. Discussion

Before considering the merits of the parties' arguments, the Court pauses to clarify the claims before it. West initially filed a seven count complaint against ten defendants. At summary judgment, the Town moved to dismiss each count, provided reasons why each count should be dismissed, and argued that West improperly brought claims against a number of the defendants. While Defendants'

arguments on the specific claims and defendants may have merit, the Court need not reach them. West does not directly address Defendants' arguments nor does he specifically explain why his seven counts should survive summary judgment. Instead, West seems to reduce his seven counts to one general claim - that the Town violated West's Fourteenth Amendment due process rights when it terminated his employment.[4] West, thus, has waived his other claims and the Court will not consider them. Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 57 (1st Cir. 2014) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived." (internal citation omitted)); Schneider v. Local 103 I.B.E.W. Health Plan, 442 F.3d 1, 3 (1st Cir. 2006) ("It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal citation and quotation marks omitted)).[5]

---

[4] West brings his due process claim against Defendants under 42 U.S.C. § 1983.

[5] As Magistrate Judge Almond noted in his Report and Recommendation on Defendants' partial motion to dismiss, "Plaintiff's Complaint is confusing and does not clearly spell out which claims are being made against which Defendants and does not clearly identify the legal bases of such claims." (Report and Recommendation 9, ECF No. 41.) Magistrate Judge Almond did not dismiss West's claims at that juncture because Defendants did not comply with applicable procedural rules, and failed to conduct a count-by-count analysis of the legal

West cites seven alleged "genuine issues and material fact[s]" that he claims allow his case to survive summary judgment. (Pl.'s Opp'n 29-30, ECF No. 55.) At base, these purported facts raise two issues: (1) whether the Town afforded West adequate due process when it terminated his employment; and (2) whether the Town violated West's right to due process because the outcome of the hearing was predetermined and biased. The Court considers each in turn.

A. West Received Adequate Due Process

The parties do not dispute West's constitutional entitlement to procedural due process. Instead, West seems to argue that the Town did not provide him with pre-termination process and that his post-termination process was insufficient to vindicate his constitutional rights. West's assertions are without merit.

The essential requirements of procedural due process "are notice and an opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985). For employees like West, who can only be discharged for cause, this means

---

viability of Plaintiff's claims. (Id.) Defendants learned from their earlier mistakes; West, apparently, did not. As noted above, West did not follow this Court's procedures for disputing Defendants' Statement of Facts and does not provide any analysis countering Defendants' assertions that each of his seven counts fails.

employers must offer some sort of hearing before terminating the employee's employment. Id. at 542. However, when an employer offers some post-termination process, the pre-termination hearing need not be elaborate. Chmielinski v. Massachusetts, 513 F.3d 309, 316 (1st Cir. 2008). It functions solely "as an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. (internal citation and quotation marks omitted). Pre-termination process meets this low bar when it includes "(1) oral or written notice of the charges against [the employee], (2) an explanation of the employer's evidence, and (3) an opportunity to present [the employee's] side of the story." Id. (internal citation and quotation marks omitted). Further, courts do not look at the pre- and post-termination procedures in isolation. Senra v. Town of Smithfield, 715 F.3d 34, 39 (1st Cir. 2013). They look to the totality of proceedings to determine if the procedural due process an employee received was sufficient. Id.

    1. West's Pre-Termination Process

Here, West received sufficient pre-termination process. The Town first notified West that it was looking into his job performance as early as July 7, 2010, when it placed him on

paid administrative leave pending its investigation into his involvement in the maintenance of effort issue. The Town then specifically notified West that it might terminate his employment due to the maintenance of effort issue in its August 13, 2010 letter. In the same letter, the Town provided West with a detailed account of why it was considering terminating his employment and forwarded West a copy of the Report that formed the primary basis for its decision. Finally, the Town provided West with an opportunity to present his side of the story on August 20, 2010, when the parties met at the Town's attorney's office. West attended the meeting with counsel and, among other things, presented the Town with a "line by line opposition to the Almonte report." (See Pl.'s Opp'n 31, ECF No. 55.) The Town, thus, met each requirement of its pre-termination due process obligation, providing West with an adequate opportunity to respond to the Town's basis for his discharge.

    2.   West's Post-Termination Process

West's post-termination process reinforces the conclusion that the Town respected West's due process rights. During the five days of hearings, West, through his counsel, extensively cross-examined both of the Town's witnesses — Almonte, the drafter of the report on which the Town based its decision, and Hoover, the individual who decided to

12

terminate West's employment.  (Exs. 16A, 16B, 16C, Defs.' MSJ, ECF Nos. 52-18, 52-19, 52-20.)  Further, West called two witnesses of his own, and submitted a number of exhibits to the Board.  (Ex. 13, Defs.' MSJ, ECF No. 52-15.)

West argues that this post-termination process was constitutionally infirm because the Town refused to subpoena additional witnesses on his behalf.  (See Pl.'s Opp'n 40-41, ECF No. 55.)  But West cites to no authority suggesting that the Town's denial violated West's due process rights and this Court has found none.  Indeed, it is well settled that due process does not afford employees the same level of process as in courts of law; instead, it merely requires that the Town give West "a meaningful opportunity to respond to the Town's explanation for his termination."  Senra, 715 F.3d at 39; see Chmielinski, 513 F.3d at 316 ("The termination hearing is not a court of law, and the same level of process is not required.").  This is precisely the opportunity the Town afforded West.  He confronted each of the witnesses the Town presented against him, called to his defense individuals who would willingly testify for him, and presented documentary evidence to the Board in support of his case.  Particularly when considered with his pre-termination process, West received all the post-termination process the Constitution requires.

13

B.  Allegations that West's Hearings Were Predetermined and Biased

Even if he technically received adequate due process, West asserts that Defendants' motion should fail because his hearings were a "charade" and, thus, did not actually offer him a meaningful opportunity to be heard. Specifically, West argues that the outcomes of both hearings were predetermined, and that the decisionmakers were so biased that West had no chance to challenge the Town's decision. Neither of these arguments allow West's claims to survive summary judgment.

1.  West Has Not Presented Evidence that His Termination Was Predetermined

West is correct that hearings with predetermined outcomes deprive employees of their due process rights. See O'Neill v. Baker, 210 F.3d 41, 48-49 (1st Cir. 2000); Duhani v. Town of Grafton, 52 F. Supp. 3d 176, 183 (D. Mass. 2014) ("[I]t is clear that when the evidence establishes that the outcome of a municipal employee's pre-termination hearing has been predetermined regardless of the proof presented, the concerns and goals of the pre-termination hearing as set forth in Loudermill have not been met." (internal citation and quotation marks omitted)). However, in predetermination cases, the key inquiry is whether the decisionmakers retain discretion to reconsider a termination decision pending the hearing's outcome. See O'Neill, 210 F.3d at 49. Indeed,

14

even drafting and sending a termination letter prior to a hearing does not violate due process if the decisionmaker can revise that decision after meeting with the employee. Id.

Duhani v. Town of Grafton provides a useful contrast to the facts of this case. 52 F. Supp. 3d 176 (D. Mass. 2014). There, a town fired an employee for purported performance reasons. The town administrator conducted the employee's pre-termination hearing and made the initial decision to terminate the employee. The board of selectmen then affirmed the termination during a post-deprivation appeal. At summary judgment, however, the employee presented evidence that, prior to both hearings, members of the board of selectmen indicated they wanted to get rid of the employee and create a new position for a different person. Id. at 181. Though a "close case," the district court held that this evidence created a question of fact as to whether the board predetermined the outcome of the employee's due process review. Id. at 183.

Here, by contrast, West has not presented any similar evidence that the decisionmakers decided to replace West prior to his hearings. In support of his assertion, West points to the invoices from the Town's outside law firm. These invoices show that the attorneys advised the Town regarding the decision to terminate West. And read in the

light most favorable to West, the billing records suggest that the attorneys discussed among themselves the process and strategy for terminating West well before the Town notified West that it was considering terminating his employment. (See, e.g., Ex. 55, Pl.'s Opp'n, ECF No. 55-51.) But, unlike in Duhani, these invoices say nothing of the state of Hoover's decision regarding West at his pre-termination hearing nor do they suggest that the Personnel Board had decided West's fate prior to West's post-termination hearing. In short, West lacks any of the evidence that made Duhani a close call in favor of the plaintiff.

2. West has Not Presented Evidence that His Termination Was Biased

West also seems to argue that the Town denied him due process because it was biased against him. While bias in a hearing can violate an employee's due process rights, the employee generally must show that the alleged bias "deprived him of the opportunity to put his facts before the decisionmaker, or that there was an [ ] error of primary facts in the grounds used for termination that could be explained only by bias." Jackson v. Norman, 264 F. App'x 17, 19 (1st Cir. 2008) (quoting Chmielinski, 513 F.3d at 318).

West first seems to argue that his process was biased because attorney Patrick Rogers participated in both the

16

investigation into the maintenance of effort issue and West's termination hearings. (See Pl.'s Opp'n 34-36, ECF No. 55.) This argument suffers from at least two deficiencies. First, West has presented no evidence that Rogers was a decisionmaker at either of his hearings. Rogers certainly advised Hoover leading up to the pre-termination hearing and participated in both hearings. But Hoover and the Personnel Board, not Rogers, ultimately decided West's fate. Thus, West has failed to show how any bias on Roger's part prohibited West from getting a fair hearing before Hoover and the Personnel Board.

Further, even if Rogers was a decisionmaker, due process does not prohibit an investigator from also presiding over the due process hearing. Withrow v. Larkin, 421 U.S. 35, 58 (1975) ("[T]he combination of investigative and adjudicative functions does not, without more, constitute a due process violation . . . ."); see Chmielinski, 513 F.3d at 318 ([T]he terminating employer may preside [at an employee's due process hearing]."); Acosta-Sepulveda v. Hernandez-Purcell, 889 F.2d 9, 12 (1st Cir. 1989) ("Contrary to the district court's premise, it is not required that a hearing be conducted before an 'impartial decisionmaker.' In fact, the hearing may be presided over by the employer himself." (internal citation omitted)). Thus, that Rogers may have been involved in both the investigation and hearings does

17

not, by itself, make Rogers so biased as to deprive West of due process. Instead, West would have to present "special facts and circumstances" to suggest that Rogers's risk of bias or "unfairness [was] intolerably high." Withrow, 421 U.S. at 58. West has presented no such evidence.

West also argues that his hearings were biased by political prejudice. West bases this argument on his assertion that members of the Republican Party took control of the Town Council in November of 2008 and he was a holdover employee from Democratic administrations. (Pl.'s Opp'n 3-4, ECF No. 55.) West, however, presents no evidence to connect the political makeup of the Council to his termination. The school funding issue that resulted in West's discharge did not arise until mid-2010, well over a year after the new Council took power. (See Ex. 4, Pl.'s Opp'n, ECF No. 55-4; Ex. 5, Pl.'s Opp'n, ECF No. 55-5.) Further, the Coventry School Superintendent — someone West has not alleged to have a politic bias — first raised the maintenance of effort issue; he requested that RIDE look into the Town's funding of the school system. (Id.) The Town's investigation into the issue commenced after this request. (See Ex. 5, Defs.' MSJ, ECF No. 52-7.) And West has presented no evidence to suggest that politics, as opposed to West's position as the Town's Finance Director when the funding issue occurred, caused the

18

investigation to explore West's conduct.  To be sure, West believes that the Almonte Report got it wrong.  But even if West is correct and the Town erred, the error does not alone violate West's due process rights.  See Chmielinski, 513 F.3d at 318 ("[The employee] may disagree with the exercise of judgment which led to the imposed penalty of termination of his employment, but that does not state a due process concern arising out of the hearing itself."); Acosta-Sepulveda, 889 F.2d at 12 (In procedural due process claims, "[t]he alleged procedural fault cannot be the examiner's failure to reach the right result.").  West must present some evidence that the errors could be explained **only** by bias.  See Jackson, 264 F. App'x at 19.  West's evidence at summary judgment does not approach this showing.

IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

/s/ William E. Smith
_____
William E. Smith
Chief Judge
Date: January 11, 2016